Good morning, Mr. Chief Judge, and may it please the Court, Muhammad Jazeel on behalf of the Florida Secretary of State. With me at Council Stable is Cameron Norris on behalf of the interveners. You might want to pull the mic up a little bit. Thank you. Thank you, Your Honor. Your Honor, on behalf of the state, I will be discussing the intentional discrimination issues as well as the preclearance issue, and my friend will discuss the First Amendment issues related to the solicitation provision and the Munson-Muir vacature issue related to the registration disclaimer provision. Your Honor, the District Court concluded that the state of Florida intentionally discriminated against black voters and subsequently applied the remedy of preclearance based on a fundamental relative flawed assumption that the state did, in fact, intentionally discriminate. The District Court, in its analysis, failed to accord the presumption of good faith to which the Florida legislature was due. The District Court then failed to faithfully apply the eight-factor Arlington Heights-Greater-Birmingham test, which governs here. And finally, in an error-filled conclusion, the District Court used the blunderbuss remedy of preclearance under Section 3C for a state that doesn't have a history of intentionally discriminating against its black citizens. Your Honor, turning to the presumption of good faith, it's – Unlike some other states in the South, the state of Florida was never under preclearance. Is that right? Yes, Your Honor. That's exactly correct. The state of Florida was never under preclearance. Only five counties in Florida were ever under preclearance, and that underscores a critical point, Your Honor. It's that the District Court concluded that the state should be subject to an extraordinary remedy under Section 3C. Let me ask you this. I want to know what evidence supports the District Court's finding of discriminatory intent. So, we've said that, look, you know, historical evidence that's not really related to the not really that important. What really matters is the – are the facts that lead up to the passage of the law in question. So, there was a statement by the bill's sponsor that the bill might create a learning curve but not – would not disenfranchise anyone. There's the demeanor of a witness from which the – from the Elections Division, from which the District Court inferred, contrary to the witness's actual testimony, that members of the legislature had asked about the demographics of Dropbox users. There was data from two counties showing that black voters were less than three percentage points more likely than white voters to deposit ballots – to deposit ballots in Dropboxes outside of business hours. There was an analysis of voting wait times by race in Miami-Dade County where it's more than 30 minutes. And then a survey in which black voters were 1.3 percentage points more likely to report waiting times in long lines than white voters. And then decade-old data indicating that black voters are 13 percentage points more likely to register to vote using third-party registration organizations. That's it. Yes, Your Honor. That's it. And even that data itself is flawed. You look at the two counties that the District Court relied on for the proposition that black voters vote outside of early voting hours, and in those two counties, the expert used timestamps provided by the counties. Most of the ballots in one of the counties lacked timestamps. So we've got a subset of a subset that's being used in another county in the two-county data set, Columbia County. The expert admitted in his report that there were errors in that analysis. Your Honor, the survey that's been cited, it's a survey done by Harvard University in 2020 after the election regarding Dropboxes. The problem? Dropboxes were used statewide for the first time only in that election. And, Your Honor, in that survey, it should be noted that the conclusion was, hey, some voters are more likely to use something other than the post office to deliver their ballots. That's not to say that they're going to use Dropboxes. And Your Honor underscored the lack of evidentiary support. It goes to the very heart of the analysis. There was an analysis of the impact. Remind me, I'm sorry, I don't want to interrupt you, but remind me what the options are besides post office and Dropbox? Your Honor, a voter with a vote-by-mail ballot can deposit it through the post office, through the Dropbox. They can have a relative return the ballot. They can choose to show up to early voting or in-person voting. That would reset their request. And so they can vote in person. And Your Honor, the Dropbox Can they put it in their own mailbox? Would that count? Yes, Your Honor. They can put it in their own mailbox. So everyone hopefully has a mailman could come and pick that up out of their own mailbox. Yes, Your Honor. You can also use FedEx, UPS, all of those work. We try to make it easy to vote in the state of Florida. I have a question. In your opening brief, you mentioned that Poder Latinx is not a distinct legal entity. I didn't see a lot of focus on that, but are you saying that they didn't have standing to raise the challenges that they did? Or what was the basis of your point about Poder Latinx? Thank you, Your Honor. The point there was simply this. We have a trial with 42 witnesses. Each of the plaintiff groups have a host of entities that were affiliated with it. And we did not have the ability to connect all the dots to discuss their standing. And Poder Latinx stood out to us as an entity that underscored that problem. You have an entity that, if you look at the trial transcript, said that they are not a separate legal entity. They are someone that's under the umbrella of a larger organization called Tides Advocacy. So they're not a legal entity, but they're filing lawsuits. How then are they harmed? How then could they possibly have a diversion of resource there? That was our only point, just to highlight that there are certain issues with the notion that these groups have standing to sue. But we're not contesting standing, Judge Grant. OK, even though the reason I was curious is that I think Poder Latinx was the only group that the district court based its registration delivery analysis on. That's why that stood out to me. Yes, Your Honor, for the Florida Rising plaintiffs. And they were the ones who were leading the charge on that issue. With reference to Senator Baxley's statement, where he said to look at patterns of use and say, well, you have to go about it a different way, following that quotation in the district court's opinion, the district court said, as Senator Baxley acknowledges, one, he has looked at data showing that black voters use drop boxes in ways SB90 restricts, and two, he knows that this data shows black voters will be impacted by SB90. Was the statement alone support for that conclusion by the district court, or do you know what the district court's referring to there? Did Senator Baxley, I guess my question is, did Senator Baxley make those acknowledgments? No, Your Honor, he did not. If you look at the question that was posed to him, it was assumed in his answer that, look, I'll agree, colleague senator who's asked the question, that there might be some concerns, some issues, but here's my take on it. In that question, Your Honor, I believe is omitted from the district court's order, and if you look at the further support for that proposition that the district court knew, pardon me, that the legislature knew about impacts on blacks, that was supported elsewhere only by a statement from, well, it wasn't a statement, it was the face and body language of the division director, and it was a statement by Senator Farmer that he had shared with his Republican colleagues that there would be some impacts, but the Republican colleagues, Senator Farmer being the Democratic leader, did not heed the material that Senator Farmer was obtaining from the NAACP, the ACLU, and others. What do you say Senator Baxley was referring to when he talked about the patterns of use and the learning curve? Your Honor, I don't know what Senator Baxley was talking about there. I would simply note that the presumption of good faith would be triggered here, and that would clearly go draw the worst possible conclusion from that pattern of use comment, and that's . . . You've answered it the best you can. Thank you. Thank you. Mr. Norris. Good morning, Chief Judge Pryor, Cam Norris on behalf of the Republican interveners. I'd like to start with the overbreadth and vagueness challenges to the solicitation definition, and time permitting, I'll address the motion to vacate. Starting with overbreadth, Your Honors, a law is not facially overbroad unless it is substantially overbroad, and a law is not substantially overbroad unless a substantial number of its applications are unconstitutional. The district court did not draw that conclusion. My friends on the other side don't even make that argument. They really focus on their narrow line warming activities. There's no discussion of the substantial number of applications of the law. And in this unique area, this law applies in a buffer zone around the polling place. Given our history and given the countervailing rights of voters, there is a substantial regulation of speech that is allowed within the buffer zone. Most applications of this statute are fine. In fact, the Supreme Court said in Burson that you can restrict on a content-based level the most protected speech under our Constitution, which is political speech, campaigning, signage, interactions with candidates. This court extended that in the Browning case and said, in fact, you can restrict political speech even if it has nothing to do with the issues and the candidates on the ballot. So the most protected speech under our system is something you can ban in the buffer zone. And then, of course, you could ban all pure conduct in the buffer zone. Those are also constitutional applications. So why is there standing to challenge this provision when none of the parties making the challenge were enjoined by the district court? Well, the question for appellate standing is whether any of the appellants are injured by the district court's judgment. And we think only one of us needs to have standing and two of us do. And the easiest one is the Secretary of State. The Secretary of State has a state law duty to obtain and secure uniformity in the application of the state's election laws. The district court's injunction requires solicitations in nine counties. And in the other 57 counties, those same solicitations remain banned. That is a direct harm to the Secretary's official duties, which is a well-recognized injury going back to the Supreme Court's decision in Chapman and some other cases we've cited in our brief. But if the Secretary didn't have it, we think that we have standing, too, alternatively. A motions panel of this court said so in the Democratic Executive Committee case for similar reasons. And the reasoning is the district court's judgment came down. It violated the Purcell principle. That's what the state panel found in this case. And when you violate Purcell, that causes well-known harms to political parties. You change the rules at the last minute, cause people to scramble and divert resources. So in the DEC case that I just mentioned, this court found that the Republican Party had to divert personnel and time to respond to another district court injunction that was issued late in the election process. We think that... Given that there was a full bench trial, was there any evidence of harm with respect to that entity? Or were they just allegations? Respectfully, Your Honor, we think appellate standing is not an issue that you really develop evidence on in the trial court, since it doesn't really become relevant until we got this odd injunction that only enjoins nine counties. And in those nine counties decided not to appeal. So we didn't present evidence on this. I do think there are courts that will solicit evidence sometimes, appellate courts that will solicit evidence on this question. We're happy to submit that evidence if this court needs it. But we tried to submit that evidence in the DEC case, and this court told us we didn't need to. It denied our motion to submit a declaration, and instead went off the allegations in our brief, which I think is appropriate for appellate standing. This court's not very well equipped to hold a evidentiary hearing on standing, so allegations in that brief seem appropriate to us. Let me make sure I understand something about the definition of solicitation. It seems that your adversaries read that this way, that it prohibits any engaging in any activity with the effect of influencing a voter, and just as a matter of the text, that it should be with the intent to effect? So it's with the intent to influence or effect, but because you don't have a definite article before the word effect, it seems to me that the with the has to be modifying intent to, and the mens rea requirement applies to both influence and effect. I agree, Chief Judge Pryor, and in fact, even if there was ambiguity about that, that's what the courts would read in to the statute. So when you have a criminal provision... I just don't know where the ambiguity is. That's a synonym introducing or, it seems to me. Fair, Your Honor, and there's a federal obstruction statute in this Aguilar case that we cite that has sort of a similar construction, and the Supreme Court said exactly what you're saying now, that that's how you would read it. It's not just did it happen to have an effect on someone, it's did you know it was going to and did it have that natural and probable effect, and here even, was that your intent? Is it grammatical, though, to say with the intent to effect of influencing a voter? Is that what's being suggested? That doesn't necessarily make sense to me. I'm not sure, Judge Grant, but really my friends rely on sort of the omission of the intent element on that last effects clause, but that's not the right question. Even the worst case scenario here, how a Florida court would interpret this is like the Aguilar case where at least for the effect prong, they would require something like knowledge, so you know that what you're doing has the natural and probable effect of influencing a voter, and the other thing they profess confusion on is, well, influencing them to do what? And I think that's obvious from the context. It's influencing their decision whether or how to vote. It is a statute that applies on Election Day to solicitation to voters and during the last few seconds before they vote. For my part, I think I'm understanding what you're saying on that, but what content do you think the or effect of influencing a voter adds to the definition? What is that capturing that other things aren't capturing? Yeah, I could come up with some examples. I think one reason why their vagueness challenge fails is because it clearly encompasses what they want to do. So when that language was added, there was also an exception added to the statute at the same time that says the supervisors can give items to voters in line, which strongly suggests that the ban that was added, that the language that you're quoting does not allow people to give items to voters in line if they're not the supervisor. Why wouldn't that qualify under the engaging in any activity with the intent to influence a voter? I actually am curious for examples of what would qualify as activity with the effect of influencing a voter as opposed to activity with the intent to influence a voter. I haven't thought about that breakdown, Judge Grant. I will say that if the statute is broad and potentially superfluous, that does not make it unconstitutionally vague. If those have overlap, I think what they were trying to get at is examples of interactions with third parties and voters that are not covered by the sort of specific examples that are listed earlier in the statute. So the statute, for example, says you can't try to sell things to voters. And I think this new phrase adds you also can't try to give things to voters that are free. You can't, I think, I suppose the statute was designed this way potentially to take away maybe the intent standard, maybe only required knowledge for certain effects instead of intent. I do think this new phrase covers threatening voters. I think it covers discouraging voters from voting. Those things are not covered by the rest of the provision. And the last thing I'll say is it's important to keep in mind that this is a part of a non-exhaustive definition of the word solicit. Solicit is the operative language. I think what Florida was trying to do was clarify a couple more examples of things it meant when it said solicit. But it's not meant to be exhaustive. It's just meant to provide some more clarity to supervisors and voters. You don't have any examples for me on the distinction between those two? Between intent and effect. I suppose if they are legally discreet, it takes away the defense that someone said, well, I didn't mean to affect what they were going to do. I just wanted to give them water. I just wanted to have this interaction with them. I didn't mean to influence. I don't care if they vote. I don't care who they vote for, et cetera, et cetera. But Florida wanted to get to banning all giving items to voters, no matter whether that specific intent was present or not. I think because when you have these opportunities for third parties to approach people in line, as the supervisors testified, it's really hard to figure out what that person is doing with that voter and what they're saying to them. And so it's something of a prophylactic measure. I think it takes away sort of a specific intent defense. And you did suggest that because the conduct, the line warming conduct seems pretty clearly to be covered, that it's impossible for a vagueness challenge to rise from those plaintiffs. Is that my understanding you correctly on that? Correct. That's what the Supreme Court said in the Holder case. The Holder, yeah. Okay. Any other questions? Okay. You've saved a couple minutes, Mr. Fox. It's not surprising that given the number of lawyers and the complexity of the case, we're going to probably have some going over the clock, but we'll keep doing our best. Good morning, Your Honors, and may it please the Court. I'm David Fox on behalf of the League Plaintiffs. I will address the First Amendment issues, including vacatur, if there's time. My colleagues, Mr. Friedman, will address the merits of discrimination, and Mr. Fletcher will address the preclearance remedy. I want to start with Chief Judge Primer's question about the construction of the statute. Respectfully, I don't think that construction works. I think that the statute has a pretty clear parallel construction where it has a noun and then an infinitive. So it's the effect to influence, or excuse me, it's the intent to influence or the effect of influencing. It doesn't have to be. I mean, it's awkward, isn't it? I mean, what you would really do is you would write with the intent to influence or the effect of influencing. You wouldn't have left out the definite article, but I get your point. Or effect of influencing. I mean, it's just, it's not well written. It would be clearer with the additional the, but I do think the, it clearly covers both of those things. Where it's not clear is then in two respects. First of all, what, in what respect must a voter be influenced? And second of all, the very requirement of effect of influencing being sufficient is vague because it makes liability turn on a subjective mental state of a third party. What about the point from Holder that if the statute clearly covers your conduct, you can't raise a vagueness challenge? This statute does not clearly cover our client's conduct. In particular, the ambiguity around influence in what respect is directly implicates what our clients do. Because what our clients do, they're nonpartisan organizations. They want to go and encourage people to vote, but they don't encourage people to vote in any particular way. And so the statute is ambiguous as to whether it covers that. In fact, the secretary vociferously argued below that the statute does not cover what our clients do. And only now on appeal has changed his position and argues that it does cover what our clients do. So that ambiguity directly implicates our clients. Let's assume it does. What's the problem? So if it covers what our clients do, there are two problems. One is this court, it's still vague in that respect. And this court, it's a state statute. This court can't adopt a limiting construction to avoid vagueness unless it's reasonable. Why doesn't it just mean we're going to have this buffer zone around polling places and you just don't need to be harassing, no matter what the intent, you know, disturbing, distracting voters? So Florida could have passed a law that said no one can talk to a voter in a polling place. That would not have been vague. It might have other issues. It might be overbroad. It would not be vague. But that's not what this statute says. Florida also could have passed a statute, like many states have, that says you can't give items to voters near a polling place. That's much less vague. Again, it might raise other constitutional issues, but it wouldn't have this vagueness problem. But what Florida did is pass a statute that turns on these very unclear questions of intent and effect of influencing a voter. How is intent to influence really any different than the usual solicitation? It goes beyond. So in Burson and in Manske both, the Supreme Court was concerned with partisan campaigning, influencing how voters vote. And when the Supreme Court talked about having a compelling interest or having a strong interest in regulating those issues, it was talking about protecting people from campaigning and attempts to influence how they vote. The Supreme Court has never said, and this court has never said, that there's a strong interest in preventing voters from being encouraged to vote. And that's a very different thing, because voting is a civic responsibility. And so it is not the same. And by going beyond protecting voters from campaigning to now, for the first time in the statute, supposedly, according to the other side now, protecting voters from being encouraged to vote, that's a very different interest. And they haven't shown that that's a compelling interest. And so that's why this is different. Is it really about protecting the peace and quiet of voters, keeping them from being disturbed by anyone while they're doing their civic duty? Well, Florida already has and continues to have, even if the court's judgment goes back into effect, a prohibition against disturbing voters around polling places. And that prohibition allows supervisors of elections to order people removed if they are causing a disturbance. But that's a very different thing from this prohibition, because this prohibition, by creating a violation of the election code if you have the intent or effect of influencing a voter, this prohibition leads to an immediate misdemeanor liability. And so for our clients, as the record below shows, that is a big difference, because they're willing to do something. And if someone thinks it's disturbing, they'll stop. But it's very different to risk arrest for a misdemeanor. Thank you, Your Honor. OK. Do you have any questions, too? No. OK. Mr. Friedman. Good morning. May it please the court, John Friedman for the Florida Rising Plaintiffs. As Mr. Fox mentioned, I will be addressing the merits of the discrimination finding. The trial court went through the record support for it. Did I get it right? I think you got what the defendants have cherry-picked. I think the record is much better. I read the district court's opinion. Did I get it right? No. What else is there? I think that starting with drop boxes, there's extensive additional analysis that the defendants haven't noted, including additional studies by Dr. Heron. You did mention the study by Dr. Smith. There's corroborating evidence from Mr. Cooper's analysis of who you actually use as drop boxes. The drop box testimony and data that I looked at, the data was statistically insignificant differences when it comes to race. I think it's important to remember that this is under- The district court made a deal of the partisan differences and from that inferred something, but that the racial data didn't show. I don't think that's an accurate reflection of what the trial record was. I think it's also important to remember that this is unclear error review and they introduced no expert testimony on this. They are cross-examination on these issues, didn't elicit the same issues that they're highlighting in the brief. On third-party voter organizations, I also think that your honor described it as a decade-old evidence. That's not correct. The evidence is from the current voter rolls, identifying both Dr. Heron and Dr. Smith, identified the number of voters registered through third-party voter organizations found that much more significant for registering black voters. 15 percent, right? It's under certain measures, it's 15 percent. Under other measures, it's 10 percent. Senator Farmer, in his testimony, confirmed that the legislature knew this. He testified to those percentages that that was being discussed by the legislature. We also had testimony that that information was elicited by- from the Secretary of State. I don't think that there's any question that the legislature asked the Secretary of State for third-party voter registration. Do you know why, based on the litigation history, the district court rested its decision on the registration delivery provisions on just POTR Latinx? I do know that we put in extensive testimony as to each of our clients and why they have that. That's at Documents 652.1 and 652.2, which are Appellate Volume- I'm sorry, Appendix Volume 17, pages 212 to 227, lay out very, very clearly. I also think that the issue with regard to POTR Latinx is simply a capacity issue that wasn't raised below and is waived. It's not a jurisdictional issue for reasons we cite in our brief. What if it's a standing issue, though? It's- I mean, I'm not- I would like to not make a standing decision because I suspect that many others have standing. I was just a little bit confused because I'm not sure if an entity is not a real legal entity, it's a little confusing about how they could have standing. The argument that they raised in their appeal was that POTR Latinx doesn't have capacity to sue or be sued. That's different than a standing issue under the authority that we- No, I know what they raised. My concern is different than what they raised. The point is we can raise standing sua sponte. In fact, we have an obligation to if we have a concern about it. The district court's findings on standing as to all of our clients to challenge all of the claims issues we do are not clearly erroneous. We lay out the evidence in detail in the- it's laid out in the appendix at the pages I cited. It's not clearly erroneous in light of all the evidence we put before. I mean, we had witness after witness come up and testify about how, for example, the registration delivery was impacting their operations. How each of them had to put additional resources into it. What that was detracting from clearly sufficient to establish standing under Haven's royalty. So we looked up and it looks like that group has a taxpayer identification number but hasn't filed anything about  So I suppose that's enough to be an entity. But is it hard to say that they've diverted resources if they haven't reported any resources? They've definitely diverted what they're doing. They've changed what they do. There was extensive testimony in the trial record about how much more they had to put into their compliance program. How many fewer resources they could actually put into registration. That particular group? Yes. At the places that you cited? Yes. We'll take a look at that. Thank you. I think taking a step back. So I just want to be clear on really two points. The first is that the trial court properly applied Greater Birmingham Ministries and Arlington Heights to their letter. The defendants, aside from the few issues that they raise, don't really identify errors in the trial evidence. The trial court findings are backed by layers of cumulative overlapping evidence. Particular significance that support the finding. The district court findings on the sequence of events. The surgical targeted nature of particular practices. Leading up to the passage of this bill, there was unprecedented black voter turnout far beyond what was any prior election. With mail ballot usage among black voters doubling from what it was in 2016. Let me ask you about the sequence of events factor. From the record, it looks like the county supervisors of elections asked the legislature to pass the registration delivery provision. But I don't see where the district court took account of that. I believe the district court did acknowledge that. I can't cite the page here, but I do believe that that was acknowledged. I think... Let's say it didn't. Would there nevertheless be enough evidence to support your argument based on the Arlington Heights factors? Certainly. I think that the registration change was two changes in the same provision. The sponsor's contemporaneous explanations, which this court is supposed to take notice of under basic equal protection analysis, what the actual rationale was, was that this was required by a court injunction. I think the district court properly analyzed there's nothing in any court injunction that required the particular changes, making it more burdensome for groups to engage in registration. I think that the pretext alone in the explanation supports an inference of a discriminatory motive. Why wouldn't those provisions actually make it more likely that new voter registrations from third party voter registration organizations would be received in time? Why wouldn't that actually help, frankly, the mission of those groups rather than hurt it? I think there are two answers to that. The first is I refer you back to the testimony I referred you to on the standing issue where the groups explain how complying with this obligation diverted from resources actually putting people in the field. Well, right, but if the resources, if you put more people in the field who don't get their registrations in in time, then how does that help anyone? The second point I was going to make is the lack of evidence that anybody's registration did not get in on time. There's just simply not, that simply wasn't presented with the trial court. It's simply not an issue. It's simply- The organization, there was testimony wasn't there that the organizations were dumping large numbers of registration forms in populated counties. In a county like Orange County, where Disneyland is and people come from all over the state, yes, that may be the case that people are just trying to- And the lobbyists for the election supervisor said that this was a priority to do something about this problem, right? It was on their long list. Yes, I've acknowledged that. Now, the last point I just want to make is that this is clear error review and that last year in explaining what that means, Justice Alito in the Pradovich decision wrote, if the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse, even if it is convinced it would have weighed the evidence differently in the first instance. The district court's findings here far exceed plausible. They're strongly supported by the entire record in this case. Thank you, Mr. Freedman. Mr. Fletcher. May it please the court. I'm Michael Fletcher. On behalf of all plaintiffs, I'm going to address the preclearance, the district court's preclearance remedy. This court should affirm the tailored and time-limited preclearance remedy adopted by the district court because the district court correctly analyzed preclearance by looking to Jeffers instead of Shelby and concluding that Florida's longstanding pattern of targeting black voters firmly justify a preclearance remedy here. This court should affirm the preclearance remedy adopted for three reasons. The lower court fully analyzed Section 3C. The remedy is supported by the court's extensive intent analysis and the court tailored the remedy to the violations found here. The lower court applied the correct standard by looking to Jeffers rather than Shelby because Jeffers specifically discusses Section 3 preclearance. The Shelby court discusses Sections 4 and Section 5 of the Voting Rights Act and explicitly declined to analyze any other sections of the statute. Second, the record supports the adoption of the preclearance remedy. Here, for example, the legislature actively sought out data about voting patterns and then targeted vote-by-mail procedures after black voters more than doubled the rate at which they cast vote-by-mail ballots in 2020. Preclearance is necessary to prevent an end run around the lower court's injunction. This type of violation can be repeated through new legislation that would lead to more expensive and time-consuming litigation. Given the persistent nature of racially polarized voting in Florida, black voters will continue to be an attractive target. Your colleague pointed out that black turnout increased dramatically in 2020. Doesn't that make it hard as a factual matter to say that there's been a long history of the sort that would merit preclearance? I mean, in just the previous election, there were extraordinary gains in turnout. Right, through the vote-by-mail ballot. But it's similar to... And overall, is my understanding. And overall, that's correct. But specifically for the vote-by-mail, because black voters doubled the rate at which they vote by mail in 2020. And then the legislature passes a law restricting vote-by-mail access through Dropbox and other means in this omnibus SB90 bill. And it's similar to in 2011, HB1355, with similar precision, goes after the days during which black voters voted early, the early voting days that blacks used to double the rate of other voters. So given that record of the Florida legislature specifically going after the means that black voters turn to just after they do that, it creates a... It makes it necessary for a preclearance remedy to stop other impermissible laws that may be passed in the future to target black voters. And third, the court correctly imposed a preclearance remedy, which is tailored to the three violations that were found here, Dropboxes, line warming, and third-party voter registration organizations. And preclearance provides a necessary restraint on the temptation to pass impermissible legislation in the future. In conclusion, the court correctly adopted a tailored, time-limited preclearance remedy here under Section 3C and this court should affirm. Okay. Thank you, Mr. Fletcher. Mr. Jazeel, you have two minutes. Chief Judge Breyer, is it okay if I go first? Let the state have the last word. No worries. Back to the solicitation definition. My friend said that it is vague as applied even to them because it's not clear why they would be influencing anyone if they're not outright electioneering. But electioneering is only about half of what the solicitation definition is about. The other half and most of the things it covers is about bothering voters. It's about going up to this captive audience and asking them for things and giving them things. And to understand that state interest, you just have to read this court's decision in Browning. It explains why there needs to be a zone of peace and quiet around that last few minutes, about half a football field around the polling place. Distracting behavior is your point. Right. It may seem to some voters they probably do appreciate getting food and water. To other voters, if you read George's amicus brief in this case, there's examples of line warming groups wearing, all wearing blue, for example. And there are voters who get confused that they are the poll workers or that the League of Women Voters is running this precinct. That deters some people from voting and it makes some people lose trust in the integrity of the election. That's what Florida was trying to do. That is perfectly constitutional under Browning in person. And I would add one point I didn't get to make, but I'd like to just stress is that even as applied to them, I just want to point out that line warming, we do not believe is speech. Giving people food and water is giving people food and water. This court in Food Not Bombs 2 said that distributing food almost always is not speech. It was speech in the very rare circumstances of that case. Those circumstances are not present here. It's hard for me to understand how giving food and water can have the intent of influencing a voter, but also not be expressive. Well, I don't think it's that. I mean, I think it's what the supervisors testified to is that it gives an opportunity for the impermissible intent. It gives you a sort of an excuse to approach voters, which then can't be policed very clearly or very easily by supervisors. But also to be speech, it has to not just be motivated subjectively. It's not about their subjective motivations. It also has to be that a reasonable observer looking at someone giving out food and water would say, oh, they're not actually giving out food and water only. They're doing that to send a message. And the message is X. I think if you didn't think that voters were often taking that away from the conduct, then it would be seen as less of a problem, right? If everyone legitimately just thought that there were friendly people handing out water, then it would, I would think, be less of a concern.  it's people are trying to influence votes by handing out water, by wearing certain outfits, et cetera, et cetera. I just don't see how that's pure conduct in this context. I understand, Judge Grant. I do think the state has a commotion based interest that the court discussed in Browning. That's not about sort of the intent of these people. It's about creating an environment where voters have to run the gauntlet just to vote. And that discourages them from showing up. It has nothing to do with speech. But even if the intent is to sort of discourage this activity because it's an opportunity for electioneering, which is an important part of Florida's interest. Preventing electioneering in the buffer zone is a permissible regulation of speech. It's perfectly legal since Burson. Thank you. Thank you, Your Honor. Mr. Gessell. Thank you, Your Honor. I'd like to close with two points that were raised by my friends. Number one, on the clear error standard. The clear error standard is not a free pass. If I understand my friend's argument, it's that lots of low quality evidence piled on itself somehow morphs into the kind of evidence you need to strike down facially neutral laws. And that's just not the case. I would point the court. Just little low quality evidence, not a lot. Well, a little or a lot is still low quality, Your Honor. And we would submit that's not good enough to establish what you need to to take down a facially neutral state statute. Secondly, Your Honor, on preclearance, the point was made that the Jeffers test is appropriate. We believe that the Shelby County test is appropriate. You need flagrant, pervasive evidence of discrimination to justify this kind of extraordinary remedy. But even if Jeffers applies, Your Honor, that test, too, is not met. Your Honor, I would like to point the court to the fifth and sixth Jeffers factors that talk about whether or not this type of activity will reoccur. And the district court's sole reason to conclude that this kind of activity would reoccur, this is on page 277 of the opinion, is that the governor of Florida is Republican and the state legislature is Republican. So this evidence-free notion that somehow, because the state has Republicans, we're going to discriminate against our black citizens is an insult. And, Your Honor, this is the type of conclusion that cannot possibly justify intrusion into the sovereign rights of the state for the next 10 years. Finally, Your Honor, Judge Grant, you discussed the poter latinx. I'd simply like to point you to pages 225 and 226 of the transcript where the witness for poter latinx on cross-examination conceded that this is not an independent organization. It is not a registered third-party organization. It cannot file a lawsuit on behalf of the parent entity, Tides Advocacy. That's all I have, Your Honor. Thank you. We urge you to reverse. We'll move to our next case.